# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **SHIRLEY JUSTUS, ADMINISTRATOR OF THE ESTATE OF MARK A. JUSTUS, DECEASED**, | )<br>)<br>) Case No. 1:06CV00117<br>)<br>) **OPINION**<br>) |
| Plaintiff, | ) |
| v. | ) By: James P. Jones<br>) Chief United States District Judge<br>) |
| **COUNTY OF BUCHANAN, ET AL.**, | )<br>)<br>) |
| Defendants. | ) |

*S.D. Roberts Moore, Eunice P. Austin, and William Wirt Brock, IV, Gentry Locke Rakes & Moore LLP, Roanoke, Virginia, and Robert J. Breimann, Street Law Firm, LLP, Grundy, Virginia, for Plaintiff; Jim H. Guynn, Jr., Guynn, Memmer & Dillon, P.C., Salem, Virginia, for Defendants.*

In this civil action seeking damages as the result of a jail suicide, I find that the plaintiff has failed to present sufficient evidence of liability and thus enter summary judgment in favor of the defendants.

I

On January 4, 2005, Mark A. Justus, a thirty-five-year-old college graduate with a long history of mental illness, tragically hung himself in the Buchanan County, Virginia, jail, where he was being confined awaiting trial on a sexual offense. His

mother, Shirley Justus, qualified as the administrator of her son's estate and brought this action seeking damages as a result of his death. The suit bases recovery on 42 U.S.C.A. § 1983 (West 2003) and a pendent state cause of action for negligent wrongful death. The defendants are C. Ray Foster, the Sheriff of Buchanan County, and two jailers on duty at the time of the suicide, Danny Lowe and Billy Stiltner.[1]

After discovery, the defendants have now moved for summary judgment in their favor, which motion has been briefed and argued and is ripe for decision.[2]

II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.,*

---

[1] The original defendants named by the plaintiff were the County of Buchanan, the Buchanan County Sheriff's Office, the Commonwealth of Virginia, the Virginia Department of Corrections, and Deputies Lowe and Stiltner. The plaintiff eventually voluntarily dismissed all of these defendants except Lowe and Stiltner and added Sheriff Foster as a defendant. Sheriff Foster moved to dismiss the action against him on the ground that the statute of limitations had run, but I held that the change in parties related back to the date of the plaintiff's original Complaint and denied his Motion to Dismiss. *Justus v. County of Buchanan*, 498 F. Supp. 2d 883, 886 (W.D. Va. 2007).

[2] The defendants have also moved to exclude the testimony at trial of the plaintiff's expert witness, R. Paul McCauley, Ph.D., on the grounds that (1) the disclosure of the expert's opinions was untimely under Federal Rule of Civil Procedure 26 and (2) the opinions are inadmissible under Federal Rule of Evidence 702. While this Motion to Exclude has also been briefed and argued, in light of my decision to grant summary judgment, it is moot.

477 U.S. 242, 248 (1986); *see* Fed. R. Civ. P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotations omitted).

The essential facts of the present case, recited in the light most favorable to the plaintiff on the summary judgment record, are as follows.

The decedent, Mark A. Justus, had a history of schizophrenia, bipolar disorder, anxiety, paranoia, and delusions and had been hospitalized for these conditions several times in the three years prior to his suicide. Justus' treatment records show

that he was hospitalized because family members reported suicidal ideation and bizarre, violent, and sexually inappropriate behavior. However, he consistently denied having suicidal ideation. Doctors opined that Justus' judgment was "poor" or "impaired" and questioned his ability to consent to medical treatment. (Ex. D 2, 16, 25.)

Justus was detained in the Buchanan County jail in August 2004. After his arraignment on August 24, 2004, a conversation took place between Justus' attorney, his mother, Sheriff Foster, a jailer, and a mental health professional from Cumberland Mountain Community Services ("CMCS") about the need to evaluate Justus' mental condition after a reported psychotic episode. Deputy Stiltner completed a petition for involuntary commitment to ensure that Justus would be evaluated by CMCS. Justus' mental health evaluation indicated that he was "not an imminent danger to self or others," but noted that jail staff had been advised to place Justus on suicide watch if he were to become a behavior problem. (Ex. B & D 27-31.)

A November 10, 2004, incident report, signed by an unidentified officer, records a suicide threat Justus made to another inmate after he unsuccessfully attempted to escape from custody:

> On 11-10-04 Mark Justus was brought into the jail office from court. After taking the leg shakles [sic] off, [jail nurse Debra Magee] opened the office door. Inmate Justus got out of his chair and went to the door. He pushed [the nurse] out of his way and run outside and up the street. Myself and R. Blankenship ran after him and caught him above the post office. Inmate Justus was restrained and brought back to jail and put in 1-L. Hallboy C. Vanover came to the door and told us Mark was threatening suicide. Mark was stripped and put in the suicide suit and placed in the single cell.

(Ex. F.) It was jail practice to leave inmates on suicide watch until jail officials were advised otherwise by CMCS; however, there is no record that anyone from CMCS ever authorized removing Justus from any suicide watch.

The present defendants all deny any knowledge of any suicide threat by Justus, including the one referenced in the November 10 incident report. While Sheriff Foster explained in his deposition that he believed that he would be made aware of all suicide threats that occurred in the Buchanan County jail, he was not aware of Justus' November 2004 threat:

> Q  Did you receive notice of all suicide threats in the jail?
>
> A  Well they would let me know when I come to work the next morning one way or the other I'd find out about it.
>
> Q  What did you do after you received that notice?

- 5 -

> A   Well I would see if they [sic] was really merit to it and talk to the inmate and try to find out what the problem was.
>
> Q   Would you contact any health care provider to talk to the inmate?
>
> A   Yes, they usually did that before I got involved.
>
> . . .
>
> Q   Do you know or do you have any recollection of a suicide threat by Mark Justus in November of 2004?
>
> A   No, sir.
>
> . . .
>
> A   Here on the back [of the November 10, 2004, incident report] it says that Mark Justus had mentioned or Mark was threatening suicide, was stripped and put in the suicide suit and placed in the single cell.
>
> Q   So at that point in time would you have been contacted?
>
> A   No. They may have told me when I come back or either left this for me to read.

(Foster Dep. 23, 32, 34.)

On December 14, 2004, Shirley Justus contacted CMCS to report that her son continued to have delusions and to request that he be evaluated. She did not report that Justus was having any suicidal ideation. This information was passed on to

- 6 -

Justus' case manager at CMCS, but there is no indication that this information was reported to anyone at the jail.

On January 4, 2005, at approximately 2:27 P.M., defendant Lowe was returning another inmate to his cell when he discovered Justus hanging by a bed sheet tied around his neck and around the bars of his cell, with his feet touching the floor. Lowe stated that he first checked for a pulse in Justus' neck and, finding none, went to inform Stiltner, without ever removing the sheet from around Justus' neck. Lowe spoke with Stiltner at approximately 2:32 P.M. They did not call the rescue squad at that time, but did inform the jail nurse, Debra Magee, that, "We've got one down." (Lowe Dep. 28; Stiltner Dep. 42; Ex. M & O.) Magee understood this to mean that one of the inmates had some sort of minor injury, perhaps resulting from a fall, because this was how the expression was commonly used in the jail.

Instead of immediately taking Nurse Magee to Justus, Lowe and Siltier delayed by waiting for the chief jailer and by allowing Magee to use the restroom. When they arrived at Justus' cell and Magee discovered that Justus was hanging from a sheet, she began shouting for them to get him down. Once he was down, Magee performed CPR and other resuscitation measures with the assistance of another inmate, but not that of Lowe or Stiltner. The rescue squad was not called until approximately 2:40

- 7 -

P.M. Justus was alive when the rescue squad arrived, but he later died at the hospital from a hypoxic brain injury.[3]

Sheriff Foster admitted that the jail's video surveillance equipment was not in operation at the time of Justus' suicide or for the preceding two-year period. He also admitted that he had never bothered to read the jail policy and procedure manual that specifies that "security devices" are to be checked regularly and kept operational. (Ex. G.) Had the equipment been functioning, it would have captured images of Justus as he prepared for and committed suicide.

III

The defendants contend that they are entitled to qualified immunity from the plaintiff's § 1983 claims. The Fourth Circuit has recently reiterated the process I must follow in deciding such an issue:

> When a government official properly asserts qualified immunity, the threshold question that a court must answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. However, if a violation

---

[3] A hypoxic brain injury results from a severe decrease in oxygen to the brain, despite sufficient blood flow. *See Compact Medical Dictionary* 220 (Houghton Mifflin 1998).

- 8 -

> could be made out on a favorable view of the parties'
> submissions, the next, sequential step is to ask whether the
> right was clearly established—that is, whether it would be
> clear to a reasonable officer that his conduct was unlawful
> in the situation he confronted.

*Henry v. Purnell*, No. 06-1523, 2007 WL 2729126, at *1 (4th Cir. Sept. 20, 2007) (internal quotations and citations omitted). "The plaintiff bears the burden of proof on the first question—*i.e.*, whether a constitutional violation occurred," while the defendant bears the burden on the remaining question. *Id.* at *2.

Using this process, I will examine each defendant's liability in light of the facts.

### DEPUTIES LOWE AND STILTNER

A pretrial detainee, such as Mark Justus, is constitutionally entitled to protection by his jailers from recognized harm. Jailers thus "have a duty to protect prisoners from self-destruction or self-injury." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992).

While Deputy Stiltner was involved in the August 2004 mental evaluation of Justus, there is no evidence that either he or Deputy Lowe knew of any potential for self-harm by the prisoner. Indeed, the August 28, 2004, risk assessment of Justus by mental health professionals found him "not an imminent danger to self or others." (Ex. D 30.) Thus, the plaintiff has not shown that these defendants violated Justus'

constitutional rights because they "knew, or reasonably should have known, of the detainee's suicidal tendencies." *Gordon*, 971 F.2d at 1094.

The plaintiff contends that Lowe and Stiltner are liable because of their failure to provide him prompt medical care after they discovered him hanging. According to the plaintiff, "The question here is not whether the Deputies knew of a serious risk of bodily harm to Justus, after he was found hanging they clearly did know, but whether their actions in failing to properly respond to Justus' suicide attempt amount to deliberate indifference." (Pl.'s Mem. Opp'n Summ. J. 14.)

The difficulty with the plaintiff's argument is that there is no evidence that supports the necessary requirement that any alleged deliberate indifference be the proximate cause of the constitutional injury. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (holding that there must be an "affirmative causal link" between the alleged inaction and the harm suffered by the plaintiff). Under the present record, it would be entirely speculative as to whether any unjustified delay caused by these defendants in providing assistance to Justus contributed in any way to his death. Speculation cannot support such a claim.[4]

---

[4] For the same reason, the wrongful death action under Virginia law against Lowe and Stiltner must fail.

- 10 -

Without sufficient evidence that defendants Lowe and Stiltner violated Justus' constitutional rights, the first prong of the qualified immunity analysis has not been met and they are entitled to summary judgment.

### SHERIFF FOSTER

As the plaintiff recognizes, there can be no respondeat superior liability of Sheriff Foster under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, the plaintiff argues that the evidence shows that Sheriff Foster reasonably should have known that Justus was suicidal and failed to direct that proper precautions be taken.

I view the evidence differently. While an unidentified jailer filled out an incident report two months prior to Justus' death stating that another prisoner reported that Justus "was threatening suicide," there is no proof that this brief incident report—the sole prior indication to anyone at the jail that Justus had ever been suicidal—did not simply inadvertently escape Sheriff Foster's knowledge. Sheriff Foster expressed in his deposition the understandable expectation that suicide attempts would always be brought to his attention, but there is no proof that he knew of or ignored signs of Justus' potential for self harm.[5]

---

[5] Indeed, a month before Justus' death, his mother contacted a mental health professional about her son's mental condition—she had just visited him in jail—and the professional noted on the report of this contact that "no SI/HI [suicidal ideation/homicidal

- 11 -

Case 1:06-cv-00117-JPJ-PMS   Document 85   Filed 10/10/07   Page 11 of 14   Pageid#: 755

The plaintiff contends that Sheriff Foster is also liable because he knew that the video surveillance system in the jail had not been operating for some time and admitted that he had not read the jail policy and procedure manual that required the immediate repair of any defective security equipment.

Assuming that an operating surveillance system would have allowed the jailers an opportunity to observe Justus preparing to commit suicide and prevent it,[6] there is again no evidence that Sheriff Foster knew or should have known that Justus was suicidal. Moreover, even if Sheriff Foster were guilty of deliberate indifference in failing to keep the surveillance system in operating order, there is no indication that a reasonable sheriff would have understood from existing law that the absence of an operating system would violate the constitutional rights of a person in Justus' circumstances.

For these reasons, Sheriff Foster is entitled to qualified immunity as to the § 1983 claims against him.

---

ideation] reported." (Ex. D 32.)

[6] Had the surveillance system been operational, of course, there is no assurance that the suicide could still have been prevented. *See Brown v. Harris*, 240 F.3d 383, 385 (4th Cir. 2001) (noting that officer monitoring video screen failed to observe mentally ill inmate hanging himself).

IV

The plaintiff also asserts a state-law wrongful death claim. While I have dismissed the plaintiff's federal claims, I find it appropriate to also rule on the state law claims, in light of the extensive proceedings in this case.

To prove a claim against the defendants under state law, the plaintiff must show them guilty of gross negligence. *Lentz v. Morris*, 372 S.E.2d 608, 610 (Va. 1988) (dismissing claim against employee of an immune government entity because the "facts do not support a charge of either gross negligence or intentional misconduct"). Gross negligence is defined as the "absence of slight diligence, or the want of even scant care." *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994). For the reasons previously stated, I hold that no such evidence has been submitted in this case.[7]

---

[7] The plaintiff also contends that Sheriff Foster is liable under state law for negligence in the conduct of "ministerial duties" by his subordinates. *See First Va. Bank-Colonial v. Baker*, 301 S.E.2d 8, 14 (Va. 1983) (holding that sovereign immunity did not protect a clerk of court from liability for the act of a deputy clerk who improperly indexed a deed of trust). However, the duties here were discretionary, rather than ministerial.

The defendants also contend that under Virginia law, recovery is not permitted on account of suicide unless the person is incompetent or insane. *Brown*, 240 F.3d at 384-86. In light of my holding, it is not necessary for me to reach this issue, although it does appear that a jury issue exists as to Justus' mental capacity at the time of his suicide.

- 13 -

V

For all of these reason, I find that summary judgment in favor of the defendants must be granted. A separate final judgment will be entered herewith.

DATED: October 10, 2007

/s/ JAMES P. JONES
Chief United States District Judge